UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                          :

ELENA BENUSSI,                                 :
                                          :

                    Plaintiff,               :          12 Civ. 1261 (PAC)
                                          :

     -against-                        :          **OPINION & ORDER**
                                          :

UBS FINANCIAL SERVICES INC.,       :
                                          :

                    Defendant.         :
                                          :
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 13, 2014

HONORABLE PAUL A. CROTTY, United States District Judge:

       Elena Benussi was employed as a financial advisor by UBS Financial Services Inc.

("UBS") for almost a decade before she was fired in November 2010.  She alleges that her

termination violated Title VII of the Civil Rights Act of 1964 because UBS terminated her

employment after she reported a sexist comment from a co-worker; and the New York State

Human Rights Law and New York City Human Rights Law because she disclosed that she is

gay.  UBS maintains that Benussi was terminated for legitimate and appropriate business

reasons, and not because of retaliation or Benussi's sexual orientation.  The Court determines

that there are genuine disputes of material fact concerning Benussi's termination, which preclude

granting UBS's motion for summary judgment.

**FACTS**[1]

       Elena Benussi was an at-will employee of UBS (or its predecessor entity, PaineWebber)

in New York, New York from January 2001 until her termination on November 23, 2010.  From

---
[1] The facts stated herein are taken from the parties' submissions and are undisputed unless characterized as "alleged" or otherwise indicated as disputed.

1

December 2008 until her termination, Ms. Benussi worked as a financial advisor at UBS's branch at 1285 Avenue of the Americas ("1285 Branch"), where she was supervised by Branch Manager Kellie Brady.  Brady, in turn, was supervised by Complex Director John Decker.

## I.  Prior Incidents

Prior to being transferred to the 1285 Branch, Benussi had reported to UBS's Human Resources Department ("HR") two incidents of alleged mistreatment by colleagues.  She does not seek to recover for these incidents in this action, but they are presented here for context.  In 2004, she made a complaint alleging that a colleague had called her a "bitch" in response to her comment that "men do better here on Wall Street . . . men get better accounts."  (Watson Decl. Ex. A at 115–17.)  She replied to him that she was "insulted by this word . . . that should not be called of any woman."  (*Id.* at 117.)

In 2008, Benussi complained about two related incidents with a supervisor.  First, when she came to his office unannounced, he allegedly told her, "I don't know if I want to throw you the hell out of my office or if I want to rip your head off."  (*Id.* at 119–20.)  She testified that she felt this was a "violent threat" and that she was in tears when she called the HR officer to report it.  (*Id.* at 120.)  About a week later, the same supervisor called her into his office to discuss office moves.  Benussi alleges that after she stated that she needed some assistance moving her items, he stepped "within a couple inches" of her, "started screaming," and said "get the hell out of my office."  (*Id.* at 129–31.)  She told HR that she felt that these two encounters with the supervisor "created a hostile work environment for her" and that she "would like to be able to move to another branch."  (*Id.* Ex. I.)  UBS accommodated her request and transferred Benussi to the 1285 Branch under the supervision of Kellie Brady.  (*Id.*)

**II.  Plaintiff's Strained Relationship With Her Supervisors at the 1285 Branch**

  Benussi was happy working at the 1285 Branch with Brady as her supervisor during the period from December 2008 to March 2010.  In early 2010, Decker, in consultation with his management team, decided to implement a performance plan to increase the productivity of the financial advisors under his supervision (*i.e.*, the financial advisors would have to produce more revenue).  The parties dispute the details of how the performance plan was to be implemented with respect to Benussi, but Benussi does not make any claims on the basis of that dispute.

  Relevant to this case, however, is that a disagreement arose between Benussi and her supervisors over the performance plan, which led to a significant deterioration in the working relationship between them.  Even though the goals for other financial advisors were similar, Benussi felt that the goals assigned to her were unfair, and that she was not given sufficient notice of those goals.  When Benussi approached Decker to express concerns about the goals, Decker reprimanded Benussi for refusing to communicate with her direct supervisor, Brady.  According to Benussi, Decker told her not to make any more complaints, and that "[i]f there's any more complaints, he said, I will bounce you out of my building."[2]  (Palmieri Decl. Ex. A at 34–35.)  Following this exchange, Brady scheduled weekly "coaching sessions" with Benussi to ensure her progress toward the performance goals.

  On May 19, 2010, Benussi expressed concerns to Brady about Brady's personal relationship with a colleague, Todd Cowan.  Benussi thought the existence of the relationship was unprofessional and was concerned that Brady might be sharing Benussi's confidential information with Cowan.  Brady responded that she had disclosed her relationship in accordance with UBS's policy and that she would not share confidential information with Cowan.  During

---

[2] UBS does address this allegation in its motion papers.

this time period, Gaye Thurston of HR also told Benussi that the relationship between Brady and Cowan had been disclosed and that UBS was satisfied that there was no conflict of interest.

On May 20, Benussi wrote an email to Thurston with a number of complaints about what she viewed as unfair treatment by Brady and Decker, and she memorialized her concerns about the Brady/Cowan relationship.  She informed Thurston that she would "not be signing a formal business plan after Memorial Day," and, in a follow-up email, stated that she would be canceling the coaching sessions.  (Watson Decl. Ex. P.)  Later the same day, Benussi separately emailed Brady to cancel the coaching sessions and further stated, "I do not want to work for you or any BOM at 1285 and will be discussing my decision with Gaye Thurston." (*Id.*)  In a third email that day, Benussi responded to an event invitation from Brady by stating that "[i]t's too late to salvage our work relationship" and "I hope to transfer out to another UBS branch." (*Id.* Ex. S.)

After Thurston met with Benussi to discuss her transfer request, Brady and Benussi had a meeting.  At that meeting, Brady characterized at least one instance of Benussi's conduct as "insubordinate."  Benussi wrote another email to Thurston on May 26 in which she referred to the meeting as "a forum to bully me with insubordination threats," again complained about the Brady/Cowan relationship, and stated a litany of other complaints that are unrelated to her discrimination claims in this case.  (*Id.* Ex. R.)  Thurston informed Benussi on June 10 that her transfer request was denied.

After the denial, the relationship between Benussi and Brady improved for a time. Benussi expressed a hope to "reset the landscape" with respect to her relationship with her supervisors.  (*Id.* Ex. T.)  Indeed, her emails to Brady in June 2010 reflect a significant change in tone, with Benussi making such compliments as "you're a great coach"; "[y]ou run a great

branch and should be very proud of yourself!"; "I've boasted to my colleagues in other branches about how great you've been"; and "[w]ithout any doubt, you're the best!"  (*Id.*)

The détente was short-lived, however.  On Friday, November 5, 2010, Benussi sent Todd Cowan an email to confirm that she would be participating in a "Grow Your Business" meeting that was scheduled for the following Thursday.  After receiving an automated "out-of-office" message from Cowan's email account, Benussi sent Cowan another email, this time copying Brady on the email chain: "I understand that you're on vacation and will be back on Tuesday, but want confirmation that I am included for this meeting."  (*Id.* Ex. U.)  Cowan removed Brady from the email chain and responded to Benussi that her attendance was confirmed.  Benussi then added Brady back to the email chain and wrote to Cowan:

> Thank you and appreciate your response as you been [sic] newly promoted, and have a distinct responsibility to help all FAs regardless of personal obligations.  I know it's awkward to have to email you while on vacation, and to copy Kellie as well, as manager, also on vacation, knowing you both return on Tuesday, but your email suggested a venue capacity urgency and you were the RSVP contact as you were on the Alliance Bernstein Masters Program in June.

(*Id.*)  These emails "infuriated" Brady because she felt that Benussi inappropriately referenced Brady's personal relationship with Cowan, brought up matters that had been resolved, and because Benussi added Brady back to the email chain after Cowan had removed her.  (*Id.* Ex. T at 222.)

On November 9, the day Brady returned to the office, Benussi wrote Brady an email to complain about Brady's handling of an incident earlier that day, during which Brady was attending to an employee who had fainted in her office.  Benussi wrote that when she came in to check on the person's "well being" as a "humanitarian" gesture, she was rudely dismissed from

Brady's office by another employee, and that Brady "as the office manager allowed it to happen." (*Id.* Ex. V.)

### III.  Dispute About Events in November 2010 Leading to Plaintiff's Termination

We have now arrived at the key period for the parties' dispute in this case.  UBS, on the one hand, contends that the emails and events of November 5 and 9 were the "final straw" that convinced Brady and Decker to terminate Benussi's employment.  (*See id.* Ex. E at 121; Def.'s Op. Br. 6.)  Brady testified that she met with her supervisor, Decker, on November 9 to discuss those events and expressed that "I can't continue to spend this much time managing Elena Benussi; I can't continue to repeat the same things over and over again; I can't continue to have her question and bring up my relationship . . . ." (Watson Decl. Ex. C at 226.)  Decker testified that he agreed, that they decided on that day to terminate Benussi's employment, and informed Gaye Thurston of their decision.  (*Id.* Ex. E at 117, 121.)  Thurston also testified that she spoke with Decker and Brady on November 9 about their termination decision.  (Palmieri Decl. Ex. D at 214–15.)  That decision was not implemented on that day, nor was Benussi advised of the decision on that day.

Accordingly, Benussi disputes that the decision to terminate her was made on November 9.  She contends that the termination decision was made later—after she reported a co-worker's offensive remark and disclosed that she is gay.  Benussi argues that there is no documentary evidence from this time to support UBS's position that the decision to terminate her employment was made on November 9.  (Pl.'s R. 56.1 Resp. ¶ 48.)  UBS responds that its privilege log shows that Benussi's November 5 emails "were forwarded to legal on November 9."  (Def.'s Reply Br.

6.)[3]  As set forth below, Benussi also contends that subsequent documents indicate that the

decision was made following her disclosures that form the bases of her claims.

During the period between November 9 and Benussi's termination on November 23,

several significant events occurred.  Renovations at the 1285 Complex required office moves.

Benussi had previously rejected Brady's offer to move to the 15th floor.  On November 12, she

wrote an email to Brady explaining the reason for her objection:

> You said I can take have a [sic] office on 15 but can still work with you.  I
> wouldn't want that to change, but may not sit on 15 as I had an unfortunate
> situation with someone.  This email is not a complaint, and will not discuss
> details, but didn't want you to feel I haven't appreciated your help. . . .
>
> Last year, I had an unprovoked incident with a male colleague, and frankly, prefer
> to avoid this individual.  I was verbally bashed for being an unmarried woman, in
> front of colleagues, but never said anything because I wanted to make things work
> at your branch. . . .
>
> I'm still weighing my options, but this is the reason for my ambivalence about a
> relocation to the 15th Floor, and didn't want you to think I couldn't make a
> decision, but didn't know how to tell you without revealing details and
> haven't. . . . Please don't be concerned about this email; it's in the past, and have
> moved forward.  I have more important items on my agenda than dealing with
> another disturbed individual, but may vote against 15 and wanted you to
> understand my rationale.

(Watson Decl. Ex. X.)  Benussi contends that this email constitutes her "opposition to

discriminatory behavior that serves as the basis for the protected activity element of her

retaliation claim."  (Pl.'s R. 56.1 Resp. ¶ 52.)

UBS attempted to investigate the incident, but Benussi steadfastly refused to name the

co-worker who allegedly made the offensive comment.  Benussi alleges that on November 19,

Thurston told her, "we don't want this hanging over our head" and "we don't know what to do

---

[3] UBS also responds that Brady and Decker likely discussed printouts of Benussi's emails, as Decker recalled, rather than by forwarding the emails, as Brady recalled.  (Id.)

with you." (Watson Decl. Ex. B at 448.)  Thurston denies making those statements.  (Palmieri

Decl. Ex. D at 209.)  In a subsequent email to Thurston, Benussi wrote:

> I know your group is following protocol, and respect your position but cannot reveal this person and continue to work at this branch with potential retaliation. . . . What transpired last year was inappropriate, but I didn't report it to avoid problems since I was new at the branch. . . . It's a very difficult situation and hadn't anticipated my email would trigger an HR complaint.  It was not my intention.

(Watson Decl. Ex. AA.)  Nonetheless, Benussi disclosed to the HR investigator, Richard Hahn,

that the offensive comment was that "because I'm not married, I'm either a dyke or a slut."  (Id.

Ex. B at 399–400.)

During the investigation, Benussi says that she revealed to Brady that she is a lesbian,

although she did not use the words "lesbian" or "gay."  Benussi alleges that during the week of

November 15 through 19, she made the following three statements in the context of explaining to

Brady why she did not want to identify or work near the person on the 15th floor who made the

offensive comment:

1. Early that week, she told Brady, "I'm really private about my own life, and I lead an alternate lifestyle.  I'm not like anybody else."  (*Id.* at 497.)

2. On November 18, she said, "Kellie, just so you know, I don't date men. . . . I'm not as protected as you are . . . . I don't want to talk about my life with this gentleman [Hahn]. . . . I'm embarrassed."  (*Id.* at 409–10.)

3. On November 19, 2010, she told Brady, "it's going to be very embarrassing for me to reveal myself, you know, because I don't date men. . . . I don't want to go to another firm—I'm embarrassed. . . . I'm really sorry I told you. . . . I really hate myself."  (*Id.* at 411.)

Brady denies that Benussi said she had an "alternative lifestyle" or "d[id]n't date men."  (Def.'s

R. 56.1 Stmt. ¶ 71.)  Brady recalls Benussi saying something to the effect of "[y]ou are

protected," but Brady says she understood this to refer to Brady's working relationship with Decker—not anyone's sexual orientation.  (*Id.*)

On November 19, Brady drafted an email to Hahn to "review the events that have transpired" in the "very difficult situation with Elena Benussi."  (Palmieri Decl. Ex. T.)  The first behavior that Brady cited as "concerning" was Benussi's "publically proclaiming her fondness of me at office outings" and "follow[ing] me around at office events wanting to get all my attention."[4]  (*Id.*)  On November 22 or 23, Thurston wrote the following notes regarding Benussi's termination: "John & Kelly want to term today . . . . Too much work, unmanageable rela. at this time."  (Palmieri Decl. Ex. R; *see* Def.'s Reply Br. 7.)  In a subsequent deposition, Thurston denied that Benussi was terminated for refusing to name the person who made the offensive statement.  (Palmieri Decl. Ex. D at 241.)  On November 23, Benussi was informed that her employment was being terminated.  (Def.'s R. 56.1 Stmt. ¶ 63.)

## IV.  Defendant's 2011 EEOC Submission

In UBS's September 19, 2011 submission to the Equal Employment Opportunity Commission ("EEOC"), its account of the timeline and rationale for Benussi's termination differs from its current position.  The EEOC submission does not refer to the events of November 5 and 9 that UBS now asserts were the "final straw"; nor does it mention any discussion on November 9 of Benussi's termination.  (Palmieri Decl. Ex. Q.)  Instead, it cites as "significant" a November 18 meeting that Benussi "abruptly left" after Brady told her that she had been insubordinate and difficult to manage.  (*Id.* at 6.)  It also states that the following events led to the termination decision: (1) a November 18 email from Benussi stating that she "will not communicate" further with Brady; (2) Benussi's "continued refusal to provide the identity of the

---

[4] UBS does not attempt to explain this statement in its motion papers.

[employee] who made the offending statements;" and (3) Benussi's "repeated and almost obsessive questioning of" the Brady/Cowan relationship.  (*Id.*)  The next page of the submission repeats UBS's contention that Benussi's "failure to cooperate in internal investigations" was among the reasons for her termination (*id.* at 7)—an apparent contradiction of Thurston's deposition testimony.[5]  UBS's submission also states that "on or about November 23, UBS made the decision to terminate Ms. Benussi's employment."  (*Id.* at 6.)

UBS now contends that such "minor inconsistencies" in its story are immaterial because nothing in its EEOC submission "contradicts" Brady's and Decker's testimony that they made the termination decision on November 9.  (Def.'s Reply Br. 5.)  UBS argues that any inconsistency is resolved by the testimony of Decker and Brady that their termination decision was held "in abeyance" pending the investigation of Benussi's November 12 email.  (*Id.*)  UBS's reply brief also asserts that any inconsistencies are insignificant because its EEOC submission was "written by counsel."[6]  (Def.'s Reply Br. 5.)  The brief in which UBS makes this argument is signed by the same counsel who signed its EEOC submission.

## DISCUSSION

Benussi alleges that UBS's termination of her employment was unlawful.  On the basis of her report of her co-worker's offensive remark, she makes claims for unlawful retaliation under federal, New York State, and New York City law.[7]  On the basis of her alleged disclosures about

---

[5] UBS does not attempt to explain this apparent discrepancy.

[6] At oral argument, defense counsel conceded that the EEOC submission represented UBS's own statement.  (Tr. 11.)

[7] *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) ("Title VII"); New York State Human Rights Law, N.Y. Exec. Law § 296(1)(e) ("NYSHRL"); New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7) ("NYCHRL").

her "alternate lifestyle," she makes pendent[8] claims for sexual orientation discrimination under New York State and New York City law.[9]  UBS moves for summary judgment dismissing all claims.

A casual reading of the documents suggests that Ms. Benussi was a difficult employee, and one who required extra supervision and guidance to achieve modest financial goals.  The decision to terminate her may be fully justified.  On the other hand, Ms. Benussi worked for UBS for almost a decade.  The question surrounding the termination must be analyzed in accordance with legal standards to determine whether there are genuine disputes of material fact, and cannot be based on a prediction of which party will prevail.

## I.  Summary Judgment Standard

"Summary judgment is appropriate when, construing the evidence in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  A fact is material only if it "might affect the outcome of the suit under the governing law," and a factual dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nonetheless, "summary judgment is improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial."  *Am. Int'l Grp., Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir. 1981).

---

[8] *See* 28 U.S.C. § 1367.  UBS notes that the Court also has diversity jurisdiction over all claims because UBS does not share New York citizenship in common with Benussi.  *See* 28 U.S.C. § 1332(c).  In light of UBS's clarification, the parties apparently do not dispute that UBS's principal place of business is in New Jersey (Def.'s Op. Br. 2) and that it is incorporated in Delaware (Compl. ¶ 2).

[9] *See* NYSHRL, N.Y. Exec. Law § 296(1)(a); NYCHRL, N.Y.C. Admin. Code § 8-107(1)(a).

The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Once the moving party has made an initial showing that no genuine dispute of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(c). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.     Burden-Shifting Framework Under *McDonnell Douglas*

Benussi's claims are subject to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–803 (1973). Under that framework,

> a plaintiff first must establish a *prima facie* case of discrimination . . . . If he does so, the burden [of production] shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action.

*Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted). This framework also applies to retaliation claims. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir.

2010).[10]  Courts have characterized the plaintiff's initial burden of production in this framework as "minimal."  *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

## III.  Retaliation Claims

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  "To establish a prima facie case of retaliation, an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).[11]  Defendant disputes the first and fourth elements, *i.e.*, whether Benussi was engaged in a protected activity and if so, whether that protected activity was the cause of her termination.

### A.  Protected Activity

UBS argues that Benussi has not produced sufficient evidence that she was engaged in a "protected activity" for two reasons:  (1) she could not have reasonably believed that a single

---

[10] Courts have also traditionally applied the *McDonnell Douglas* analysis to analogous claims under the NYSHRL and NYCHRL.  *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005).  Recently, however, the Second Circuit questioned the appropriateness of that analysis for NYCHRL claims in light of a 2005 amendment intended to reduce plaintiffs' burdens under that law.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013) ("It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims.").  Since the Court concludes that Plaintiff prevails in this motion under the potentially more exacting standards of Title VII and NYSHRL, it is unnecessary to decide whether she could have prevailed under the NYCHRL standard.

[11] "The standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."  *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).  The elements of a NYCHRL retaliation claim are analogous but are to be construed more liberally in plaintiffs' favor.  *See Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x 26, 27 (2d Cir. 2013).  Again, there is no need to draw fine distinctions here because the Court concludes that Plaintiff prevails even under the more restrictive standard applicable to Title VI and NYSHRL.

remark by a co-worker that she was "either a dyke or a slut" was unlawful; and (2) she did not "oppose" the conduct since her email stated that it was "not a complaint."

### 1. Reasonable Belief in Unlawful Discrimination

"A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Thus, "the plaintiff need not prove that her underlying complaint of discrimination had merit." *Lore*, 670 F.3d at 157.

UBS contends, perhaps correctly, that the single remark at issue here would not sustain a claim for illegal discrimination on the basis that it created a hostile work environment. *See Riscili v. Gibson Guitar Corp.*, 605 F. Supp. 2d 558, 566 (S.D.N.Y. 2009) ("In general, a single offensive remark does not violate the law.") But as it concedes, the issue in a *retaliation* claim is not whether the complained-of conduct actually violated the law, but whether the complainant reasonably believed that it did.

UBS cites several cases in which isolated offensive remarks were held insufficient to support a reasonable belief that they were unlawful. (Def.'s Br. 12–14.) In those cases, however, the remarks at issue were not directed to individuals on the basis of their membership in a protected class, or the complainant had conceded that he had no reason to believe they were unlawful.[12] Such general, crude remarks—which are not addressed to an individual's protected status—stand in contrast to the remarks allegedly directed at Benussi.

---

[12] *See, e.g.*, *Clark County School District v. Breeden*, 532 U.S. 268, 269–71 (2001) (plaintiff's co-workers laughed after reading aloud a job applicant's psychological profile, which reported that he once made the explicit sexual remark at issue); *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 628 (7th Cir. 2011) (plaintiff "by his own admission had no reason to believe that [a young male employee] felt sexually harassed by [an older female employee's] remarks" about "dating men his age"); *Middleton v. Metro. Coll. of N.Y.*, 545 F. Supp. 2d 369

Here, Benussi reported that she was "verbally bashed" for being "an unmarried woman," and that the speaker remarked that she must be either a "dyke or a slut."[13]  Benussi said that the incident had made her so uncomfortable that she did not want to work on the same floor as the person who made the comments.  As a result of her report, her employer launched an investigation into these comments and repeatedly asked her to reveal the name of the person who made them.  Indeed, UBS's HR representative allegedly said that "we don't want this hanging over our head."  Thus, Benussi alleges that the comments were personally directed at her because of her gender, that she was uncomfortable working near the speaker as a result, and that her employer expressed serious concern about the alleged comments.  Under these circumstances, a reasonable jury could conclude that Benussi reasonably believed that the comments were unlawful.

Nothing in *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170 (2d Cir. 1996) compels a contrary result.  There, the court hypothetically commented that "plaintiff likely would not have passed the 'good faith reasonable[ness]' test" if the only evidence offered at trial had been [her supervisor]'s isolated comment" about whether his "pecker is getting in the way."  95 F.3d at 1179.  Although other circuits have apparently split on whether "a single offensive remark may support a reasonable, if mistaken, belief that the law has been violated," at least one court in this Circuit has answered in the affirmative.  *Riscili v. Gibson Guitar Corp.*, 605 F. Supp. 2d 558, 566 (S.D.N.Y. 2009) (citing conflicting holdings in the Fourth and Seventh Circuits).  There, Judge Holwell concluded that where the plaintiff's employer initiated an investigation into an offensive comment, he "justifiably could have believed that his employer thought the law had

---

(S.D.N.Y. 2008) (no evidence that vulgar "offhand comment" made during a "heated encounter" was "suggestive of an unwanted sexual advance").

[13] Defense counsel conceded at oral argument that these were gender-based slurs.  (Tr. 27.)

been violated" and therefore "a jury could rationally infer that [plaintiff]'s belief [that] the law was violated was reasonable." *Id.* at 566–67.

It is for a jury to decide whether Benussi reasonably believed that the comment was unlawful. To the extent that multiple incidents are required to sustain a reasonable belief in unlawful conduct, the Court notes that Benussi had made two prior complaints to HR about inappropriate treatment in 2004 and 2008. Although Benussi does not claim that she was terminated in retaliation for reporting those prior incidents, they provide some context for the reasonableness of her belief that the offensive remarks at issue were unlawful. Indeed, she was transferred to the 1285 Branch after claiming that a prior supervisor had "created a hostile work environment." Accordingly, a jury is the appropriate arbiter of whether Benussi's belief was reasonable in this case.

### 2. Opposition to Discrimination

Next, UBS contends that Benussi failed to "oppose" discriminatory conduct because her email stated that it was "not a complaint" and because she refused to name the person who made the offensive comment.

"The term 'oppose,' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize . . . ; to contend against; to confront; resist; withstand.'" *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (citations omitted). There is no need to exhibit "'active, consistent' behavior" in order to "oppose" discriminatory conduct: a person may "oppose" conduct by "tak[ing] no action at all to advance a position beyond disclosing it." *Id.* at 277. Thus, it is unnecessary to "'instigate or initiate' a complaint to be covered" by the anti-retaliation laws. *Id.* It is sufficient for a plaintiff to make "an ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee." *Id.*

Here, a jury could reasonably interpret Benussi's conduct as opposition to the offensive comments. While she did not lodge a formal complaint, she made clear that she disapproved of the comments and felt she had been "verbally bashed." Moreover, her objection to working on the same floor as the person who made the comments was a form of "standing pat" in the face her employer's suggestion that she move there. *See Crawford*, 555 U.S. at 277.

**B.  Causal Connection**

**1. Prima Facie Case**

UBS argues that an additional, independent basis for summary judgment is that Plaintiff has failed to produce evidence in its prima facie case that Benussi's report of the offensive comments was the *cause* of her termination.

Unlike discrimination claims, Title VII *retaliation* claims are subject to the stricter standard of "but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2523, 2533 (2013) (noting that discrimination claims are subject to a lesser, "motivating factor" standard). Nonetheless, "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010); *see Bagley v. J.P. Morgan Chase & Co.*, No. 10-CV-1592, 2012 WL 2866266, at *9 (S.D.N.Y. July 12, 2012). And though "the intervening period must be 'very close,'" *id.*, courts have found an intervening period of less than a month to be close enough to infer causation. *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (period of February to March); *Bagley*, 2012 WL 2866266, at *10 (citing cases where longer periods were close enough).

17

Here, UBS terminated Benussi's employment within eleven days of her report of the offensive comment.  Coupled with the HR representative's alleged statement that "we don't want this hanging over our head," a jury could reasonably find that Benussi has made a prima facie case that, but for her report, her employment would not have been terminated.

### 2. Pretext

UBS argues that even if Benussi has made a prima facie case of retaliation, she has failed to produce sufficient evidence of pretext in light of UBS's evidence of its legitimate, non-discriminatory reasons for her termination.  Indeed, UBS has produced substantial evidence of its non-discriminatory reasons: that Benussi was insubordinate, difficult to manage, argued about performance goals, and repeatedly brought up concerns about the Brady/Cowan relationship which were none of her business, especially since the matter had already been settled with HR.  Accordingly, Benussi must produce evidence sufficient for a jury to conclude that these reasons were pretextual—*i.e.*, that her November 12 complaint was a "but-for" cause of her termination.

"Since discrimination plaintiffs rarely have direct evidence of discriminatory animus," they often must rely on circumstantial evidence of unlawful pretext.  *Evans v. Port Auth. of New York & New Jersey*, 192 F. Supp. 2d 247, 266 (S.D.N.Y. 2002).  Thus, "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846–47 (2d Cir. 2013).  Furthermore, "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other

evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* at 847.

Here, Benussi has produced evidence of inconsistencies and contradictions in both UBS's stated reasons for her termination and in its account of the timing of the decision. First, UBS's current position that the termination decision was made on November 9 is in tension with its prior submission to the EEOC in which it stated that "on or about November 23, UBS made the decision to terminate Ms. Benussi's employment." The timing of the decision, of course, is critical in this case because Benussi reported the offensive comment in the period between when Decker and Brady now say they made the decision (November 9) and when UBS's EEOC statement says the decision was made (November 23). UBS may be correct that it is logically possible to construe its EEOC statement as consistent with the proposition that the decision was made on November 9 and "held in abeyance" until November 23. Nonetheless, a jury could reasonably view such a significant omission from UBS's EEOC submission as evidence that it subsequently altered its position as a pretext to justify the termination decision. The Court cannot assess Decker's and Brady's credibility on a motion for summary judgment. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."); *see also Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (summary judgment inappropriate where "state of mind, motive, sincerity or conscience are squarely implicated"). UBS's argument that any discrepancies should be ignored because the EEOC statement was "written by

counsel" is unpersuasive, particularly so because the same counsel drafted both the EEOC statement and its present motion papers.[14]

Furthermore, Benussi has shown at least two inconsistencies in UBS's stated *reasons* for her termination.  First, UBS's HR representative, Gaye Thurston, denied at her deposition that Benussi was terminated for refusing to name the person who made the offensive comment, although UBS cited this as a reason in its EEOC statement (before the deposition) and in its present briefs (after the deposition).  Second, in Brady's draft email summarizing "the events that have transpired" in the "very difficult situation with Elena Benussi," Brady first cited as "concerning" Benussi's "publically proclaiming her fondness of me at office outings" and "follow[ing] me around at office events wanting to get all my attention."  That reason has appeared nowhere else in any of UBS's explanations for the termination decision.

For purposes of Benussi's retaliation claims, the issue is not whether these reasons are themselves impermissible, but whether they represent inconsistencies in UBS's account of the reasons for Benussi's termination.  Here, UBS's shifting story about the timing and rationale for the termination decision constitutes sufficient evidence from which a reasonable jury could

---

[14] Defense counsel's statement at oral argument that "generally these EEOC petition statements are not admissible" (Tr. 11) is unsupported by the cases cited in its brief.  Those cases did not hold that EEOC statements are *inadmissible* as evidence, but rather that under the facts of those cases, the minor inconsistencies were insufficient to raise an issue of pretext.  *See Sarmiento v. Queens Coll. CUNY*, 386 F. Supp. 2d 93, 105 (E.D.N.Y. 2005) (EEOC statement not probative of pretext because it "only misrepresents the manner in which [supervisors] were informed of [an applicant's] ethnicity, not the fact of their knowledge") *aff'd*, 153 F. App'x 21 (2d Cir. 2005); *McDowell v. T-Mobile USA, Inc.*, CV-04-2909, 2007 WL 2816194, at *15 (E.D.N.Y. Sept. 26, 2007) ("To the extent that a defendant's communications with the EEOC statement contain factual errors, courts have, not surprisingly, taken a case-by-case approach in determining the impact of these errors."), *aff'd*, 307 F. App'x 531 (2d Cir. 2009); *Sharon Council v. Tri-Star Const. Co.*, 01-CV-11788, 2004 WL 253298 at *3 & n.4 (S.D.N.Y. Feb. 10, 2004) (stating that such inconsistencies "*may* be," but are "not *always*" sufficient to raise an inference of pretext, and concluding that none was raised where "Plaintiff has failed to adduce any evidence . . .that would support an inference of race discrimination.").  Here, Defendant's EEOC submission is relevant and its inconsistencies with UBS's current position touch directly upon the central issues in this case: when and why the termination decision was made.

conclude that UBS's stated reasons might be pretextual.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("The inconsistency between the justifications offered for [Plaintiff]'s dismissal in [Defendant's EEOC submission and its position in district court] raises a genuine issue of material fact with regard to the veracity of this non-discriminatory reason.").

The applicable standard of "but-for" causation does not preclude a finding of pretext. Here, on the basis of UBS's own EEOC submission, a reasonable jury could conclude that the termination decision was not made until after Benussi's November 12 email.  Furthermore, a jury could conclude that the November 12 email amounted to the "final straw" that convinced Benussi's supervisors to terminate her.  Indeed, Benussi alleges that Thurston said "we don't want this hanging over our head."  Thus, a reasonable jury could conclude that had Benussi not complained about the offensive comment, her supervisors would not have ultimately decided to terminate her.  *See Nassar*, 133 S. Ct. at 2533 (defining "but-for" causation).

## IV.  Sexual Orientation Discrimination Claims

To establish a prima facie case of sexual orientation discrimination under either the NYSHRL or NYCHRL, a plaintiff must demonstrate the following: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009) (general elements for discrimination under Title VII); *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 12 (2d Cir. 2013) (citing substantially identical elements for NYSHRL); *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 297 (S.D.N.Y. 2012) (appropriate to use Title VII elements "as a guide" in analogous NYCHRL claims, though the latter are to be construed more liberally).  UBS contests the adequacy of Benussi's evidence on the fourth

element on two grounds: (1) that she cannot demonstrate that UBS had knowledge of her sexual orientation; and (2) alternatively, that she has not produced evidence giving rise to an inference of discrimination.

### A.  UBS's Knowledge of Benussi's Sexual Orientation

UBS contends that because Benussi never referred to herself as "gay" or "lesbian," no reasonable jury could find that her supervisor knew she was gay.  Given the facts here, that argument is swiftly rejected.  Benussi testified that, during the week of the HR investigation, she made several statements to her supervisor, Kellie Brady, to the effect that she "lead[s] an alternate lifestyle" and "do[es]n't date men."  Indeed, after Brady was aware of Benussi's allegation that she had been called "a dyke or a slut," Benussi again allegedly told Brady: "it's going to be very embarrassing for me to reveal myself, you know, because I don't date men. . . . I'm embarrassed. . . . I'm really sorry I told you. . . . I really hate myself."[15]

Whether Benussi actually said these things, and whether Brady understood them to mean that Benussi is gay, are jury questions.

### B.  Inference of Discrimination

For reasons similar to those applicable to Benussi's retaliation claims, *see supra* Part III.B.2, she has produced sufficient evidence of a connection between her sexual orientation and UBS's termination decision.

With respect to Benussi's prima facie case, she has satisfied her minimal burden to demonstrate an inference of discrimination.  First, as described above, there is a genuine dispute about whether UBS's termination decision came only days after Benussi's alleged disclosure of

---

[15] As set forth above, there is also sufficient evidence that Brady did not decide to terminate Benussi until after hearing these disclosures.  *See supra* Part III.B.2.

her sexual orientation.  *See Hardekopf v. Sid Wainer & Son*, 02-CV-3251, 2004 WL 2199502, at *6 (S.D.N.Y. Sept. 29, 2004) ("[T]he temporal proximity between Plaintiff's announcement of her [protected status] and her termination is such that an inference of discrimination on the basis of [that status] is raised.").  Second, after this alleged disclosure, Brady drafted an email in which she characterized as "concerning" Benussi's "publically proclaiming her fondness of me at office outings" and "follow[ing] me around at office events wanting to get all my attention."  Taking these facts together, a reasonable jury might conclude that after Brady learned that Benussi was gay, Brady felt uncomfortable with Benussi's past proclamations of "fondness," which at least partially motivated Brady to terminate Benussi's employment.  *See Vargas v. Morgan Stanley*, 438 F. App'x 7, 9 (2d Cir. 2011) ("motivating factor" standard applies to NYSHRL discrimination claims; NYCHRL cases are construed "more liberally").

   With respect to pretext, Benussi has met her burden for the same reasons discussed above: UBS's timeline and rationale for her termination reflect significant inconsistencies.  *See E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) ("From such discrepancies a reasonable juror could infer that the explanations given by [Defendant] . . . were pretextual . . . .").  Accordingly, there is a triable issue of pretext for Benussi's sexual orientation discrimination claims.

## CONCLUSION

The record reveals that there are genuine disputes of material fact concerning Plaintiff's claims, which preclude the grant of summary judgment. While the evidence may not be compelling, Benussi has met her burden to produce evidence sufficient for a reasonable jury to find in her favor. Accordingly, the Court DENIES the Defendant's motion for summary judgment in its entirety.

Dated: New York, New York
     February _14_, 2014

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

24